UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

NATIONAL PRODUCTS, INC.,

    Plaintiff,

v.                                   Case No. 6:18-cv-543-Orl-37DCI

HIGH GEAR SPECIALTIES INC,

    Defendant.

## MEMORANDUM OPINION AND ORDER

This cause is before the Court following a one-day bench trial. (*See* Doc. 120.) Having considered the pleadings, evidence, argument, and relevant authority, and having made determinations on the credibility of the witnesses, the Court renders its decision on the merits of this case under Federal Rule of Civil Procedure 52.

## I.    BACKGROUND

Plaintiff National Products, Inc. ("**NPI**") brought this patent-infringement action against Defendant High Gear Specialties, Inc. ("**High Gear**"). (Doc. 1.) NPI manufactures rugged mounts for various electronic devices, such as phones and laptops, and holds numerous patents. (Tr. 19:5–17, 20:17–19.) High Gear designs and manufactures mounting systems for motor sports. (Tr. 145:10–13.) One such system, the TechGripper holds smartphones during rugged motor sports, such as off-road motorcycling or ATVing. (Tr. 145:19–146:10.) NPI alleges the TechGripper infringed on one of its patents. (Doc. 1.)

-1-



High Gear TechGripper Product

After litigating for almost three years, the parties moved to stay the case pending the resolution of a related action ("**Arkon Action**"). (Doc. 60) In their motion to stay, which was granted, the parties presented a stipulation to be bound by the outcome of the Arkon Action. (Doc. 60-1 ("**Stipulation**"); Doc. 65.) The Arkon Action settled, but the parties here could not agree on damages. The matter then proceeded to trial. (Doc. 120.) Patent validity and patent infringement are not at issue. (JPS ¶ 11.)[1] The only issue that remains is a calculation of the "lowest negotiated royalty rate" agreed to between NPI and Arkon in the Akron Action.  (JPS. ¶ 12.)

## II.     JURISDICTION

The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338. (*See* Doc. 1.)

---

[1] Admitted findings of fact, found in the parties' Joint Pretrial Statement (Doc. 105, pp. 6–8), will be cited as "**JPS.**"

### III. FINDINGS OF FACT[2]

**A.  Background**

1.  United States Patent No. 6,585,212 ("**'212 patent**"), entitled "Quick Release Electronics Platform," issued on July 1, 2003 and expires August 20, 2021. (JPS. ¶¶ 3–4.)

2.  On December 17, 2015, NPI sued, accusing High Gear's TechGripper products of infringing the '212 patent. (JPS. ¶¶ 5–6.)

**B.  Decision to be Bound**

3.  Besides High Gear, NPI sued Arkon Resources, Inc. ("**Arkon**")—claiming it too was infringing on the '212 patent. (JPS. ¶ 7.)

4.  In the Arkon Action, NPI accused numerous products, including the Arkon RoadVise, of infringing on the '212 patent. (Tr. Ex. 2, p. 1.)[3] High Gear makes the RoadVise for Arkon—it is identical to the TechGripper except for color and branding. (JPS. ¶ 8; Tr. 120:8–16.)[4]

5.  High Gear is a small company with few resources to fight a protracted legal battle with NPI. (Tr. 148:25–149:3, 150:2–10, 151:6–10.)

6.  Arkon, a considerably larger company, is one of High Gear's biggest purchasers. (Tr. 151:11–22; 154:13–15.)

---

[2] The following facts have been established by a preponderance of credible evidence. To the extent that any of these facts may represent conclusions of law, the Court adopts them as such.

[3] The trial exhibits (*see* Docs. 121–122) will be cited as "**Tr. Ex.**"

[4] The trial transcript (Doc. 124) will be cited as "**Tr.**"

7. On September 27, 2018, NPI and High Gear stipulated to be Bound by Resolution of Related Case. (Doc. 60-1; Tr. Ex. 3 ("**Stipulation**").) Essentially, High Gear and NPI agreed to be bound by the outcome of the Arkon Action, regarding the RoadVise. (*See* Tr. Ex. 3; JPS. ¶ 9.)

8. Michael Lee ("**Lee**"), the Vice President of High Gear, testified that after years of protracted litigation, High Gear believed it made little sense to continue to litigate the action itself. (Tr. 150:2–10.) Believing the issues for both Arkon and High Gear to be the same, High Gear left the fight to the better heeled Arkon and agreed to the Stipulation with NPI. (Tr. 151:11–22, 152:3–7; *see also* Tr. Ex. 3, pp. 7–10.) Lee explained Arkon is "20 times my size. So they had a lot more to fight with and for." (Tr. 152:6–7.)

9. Lee testified High Gear's goal was to pay whatever Arkon would pay for their products, adjusted for volume. (Tr. 152:11–15.)

10. The Court finds Lee's testimony credible. He was consistent and able to recall details. Lee sought the benefit of Arkon's bargain, believing Arkon was better positioned to fight NPI's allegations and, since their products were identical, High Gear would pay the same rate Arkon paid for the RoadVise. (Tr. 151:11–22, 152:3–7, 152:11–15.)

11. NPI's Chief Operating Officer, Chad Remmers ("**Remmers**"), testified to his current understanding of the Stipulation but offered no testimony as to NPI's intent when it entered the Stipulation. (*See* Tr. 28:10–11.) The Court

does not find Remmers a credible witness. *See infra* Section III, ¶ 37.

12.     On October 1, 2018, the Court issued an order (Doc. 65) recognizing the parties' agreement to be bound by the outcome of the Arkon Action and staying the case. (JPS. ¶ 10.)

**C.      Outcome of Arkon**

13.     NPI and Arkon signed a settlement agreement in the Arkon Action that resolved all Arkon claims (Tr. Ex. 2 ("**Arkon Settlement**"); JPS ¶ 13.)

14.     The Arkon Settlement also settled NPI's '212 patent claims against a related company, IBOLT. (*See* Tr. Ex. 2; Tr. 25:22–24.) Paul Brassard is the President and Chief Executive Officer of both Arkon and IBOLT. (Tr. 162:20, 164:9.)

15.     High Gear was not a party to the Arkon Settlement nor agreed to be bound by its terms—only by the "lowest negotiated royalty rate" it resulted in for the RoadVise.[5] (Tr. Ex. 2, 3.)

16.     Arkon, IBOLT, and NPI settled for a single lump sum payment of $1,000,000. (Tr. 43:11–18; Tr. Ex. 2, ¶ 3(d).) In exchange, Arkon and IBOLT received a paid-up license to the '212 patent for all accused products and a release for all 133 patents owned by NPI. (JPS. ¶ 14; Tr. 34:5–12, 46:21–47:10, 47:23–48:5; Tr. Ex. 2, ¶¶ 3(d), 4.)

17.     Paragraph 3(e) of the Arkon Settlement states:

> The Lump-Sum Royalty provided in Paragraph 3(d), above, is based on the average sales price of the "cradle" or "holder"

---

[5] To the extent this is a legal conclusion, *see infra* Section IV, ¶¶ 18–19.

portion of the licensed products, as reflected in Arkon's expert report produced in the Arkon Action, and is further based on the number of units of the Accused Products sold from the date suit was filed in the Actions through the life of the patent, based on Arkon's reported sales data that was last provided to NPI.

(Tr. Ex. 2 ¶ 3(e) ("**Paragraph 3(e)**"); JPS. ¶ 15.)

18. In Paragraph 3(e), "Arkon's expert report produced in the Arkon Action" refers to the April 1, 2019 Expert Report of George Miller, which reflects an average sales price of the "cradle" or "holder" portion as $3.38 per unit. (JPS. ¶ 16.)

### i. Arkon's Description of the Arkon Settlement

19. The CEO and principal owner of Arkon, Paul Brassard ("**Brassard**"), testified on Arkon's and IBOLT's behalf. (Tr. 162:4–20, 164:9.)

20. Brassard testified he first suggested the million-dollar settlement amount. (Tr. 164:10–14.) He felt the large sum would allow him to "ask for a lot of things I wanted." (Tr. 164:15–25.)

21. Chiefly, he "wanted to not have future lawsuits." (Tr. 165:1–9.) This was not the first time NPI had sued Arkon—there had been three lawsuits in three or four years. (Tr. 165:9–10.) Bassard was concerned NPI "was just getting started" and that Arkon would be facing one lawsuit per year, costing hundreds of thousands in legal fees and executive and clerical bandwidth. (Tr. 165:9–23.) Arkon and IBOLT wanted an escape—and they were willing to pay $1 million for one. (*Id*.)

22. Brassard testified that, in his mind, he attributes about half the value of the settlement to the release provision. (Tr. 166:15–21.) While he was not aware of any claims NPI had that were being released, he was "sure [NPI] [could] come up with one if they wanted to." (Tr. 175:7–10.)

23. The private label was also "very important" to him—it meant he could assure purchasers they couldn't be sued by NPI for his products and he could charge more for them as a result. (Tr. 166:22–167:5.)

24. And the paid-up license was valuable since, as a businessman, the "worse thing" is having to tell your competitor who you're selling to. (Tr. 167:21–25.)

25. Brassard attributed about $100,000 of the Arkon Settlement each to the private label and paid-up license. (Tr. 167:19–25.)

26. By Brassard's calculations, the Arkon Settlement left $300,000 to cover three million units—or about 10 cents a unit. (Tr. 168:1–3.)

27. Arkon had taken a license from NPI in December 2004 for 17.5 cents a unit, for products roughly the same cost. (Tr. 168:5–9.)

28. Paragraph 3(e) was added after the million-dollar figure was proposed. (Tr. 168:13–17.)

29. Brassard admitted, by signing the Arkon Settlement, he agreed to the words in the settlement, including those in Paragraph 3(e). (Tr. 172:15–19.)

30. Brassard testified he agreed to the terminology because he got what he

wanted and the "minor wording" was unimportant to him. (Tr. 169:21–23.)
"In order to get this—this agreement, [NPI] gave away the store, and I was
happy to take it." (Tr. 169:24–25.) He admitted his allocation of the lump
sum payment is not reflected in the words of Paragraph 3(e) but explained
that it was how, as a businessman, he viewed the agreement. (Tr. 174:12–
17.)

31. The Court finds Brassard's testimony on the negotiation process and his
concerns in settling credible. Brassard was consistent and able to easily
answer questions and recall details about the settlement. On cross-
examination, he answered counsel directly without obfuscation. Arkon and
IBOLT, with the $1 million lump sum payment, sought to buy their peace
from NPI. (*See* Tr. 179:10–17.)

**ii. NPI's Perspective**

32. The Chief Operating Officer of NPI, Chad Remmers ("**Remmers**"), testified
on behalf of NPI. (Tr. 17:18–18:14.)

33. He testified it was his current understanding that Arkon agreed to pay a
20.5% royalty rate to NPI under the terms of the Arkon Settlement. (Tr.
26:18–21.) This was similar to the royalty rate NPI obtained in its prior
license with Tripp Lite. (Tr. 26:22–25.)

34. He testified NPI compromised in the Arkon Settlement by foregoing pre-
suit damages. (Tr. 27:9–15.)

35.     On cross-examination, however, Remmers' understanding of the Arkon Settlement was limited. He admitted "the only thing" he knew about the Arkon Settlement was that "somebody" told him "it was supposed to work out to 20.5 percent." (Tr. 38:10–15.) He didn't know the names of the products, other than the RoadVise, that were at issue in the Arkon Action (Tr. 29:11–16); or how many sales Arkon had made of the accused products pre-suit (Tr. 31:10–12); or what number Drew Voth calculated in terms of the anticipated sales volume of the accused products to be sold under the license (Tr. 37:12–15); or the data underlying the 20.5% number he testified was the royalty rate (Tr. 38:6–9); or what license theory the Arkon Settlement proceeded on (Tr. 39:15–22); or whether the accused products were all licensed under the Arkon Settlement (Tr. 41:17–19); or even whether the 20.5 percent royalty applied to the TechGripper (Tr. 42:8–10).

36.     Remmers' recollection of the settlement negotiations was no better. He could not recall if, at the time of settlement, he knew: how many sales Arkon had made of its accused products (Tr. 30:6–11); how many accused products were sold by Arkon before filing the complaint (Tr. 31:10–15); whether he believed the number of accused products sold before filing the Arkon Action was closer to 50,000 or 500,000 (Tr. 32:16–24); the total volume of units of the accused products sold by Arkon and IBOLT (37:1–6); or what the average sales price of the cradle or holder of the licensed products was

(37:12–19). He "believe[d] the sales data was disclosed before the settlement process" but couldn't recall by whom and couldn't explain how, if Arkon never provided the data, he got the numbers.[6] (Tr. 32:8–15.)

37.    The Court does not find Remmers' testimony credible. Remmers could not answer even basic questions about the Arkon Settlement or recall details. He frequently appeared confused or uncertain or did not know the answer. (*See, e.g.*, Tr. 38:2–15; 41:2–43:3.)

**D.    Testimony of Voth**

38.    Drew Voth ("**Voth**") testified for NPI on damages. (Tr. 53:16, 57:14–19.)

39.    Voth works as a senior director at the consulting firm Alvarez & Marshal. (Tr. 53:21–54:2.) He is a certified public accountant and is certified in financial forensics, fraud examination, and valuation analysis. (Tr. 55:18–24.) For the last 27 years, he has been doing various economic consulting, calculating damages for court work, and working as an expert or a consultant on patent licenses. (Tr. 54:10–55:2.)

40.    Voth testified the lowest negotiated royalty rate was 20.5%. (Tr. 57:22.) He testified the royalty rate "has to be a percentage" of sales "because that percentage is the only amount that you can come up with in using all three

_____

[6] Counsel for High Gear, Ryan Thomas Santurri, represented to the Court that NPI didn't know any of the data at the time they entered the Arkon Settlement and that the sales data was contained in an expert report that was attorneys' eyes only. (Tr. 38:25–39:6.) NPI did not object to this assertion.

amounts per the [Arkon Settlement]." (Tr. 63:19–21.) In concluding this, Voth relied on Paragraph 3(e) of the Arkon Settlement. (Tr. 59:21–59:23.)

41.     Voth's assessment is unpersuasive. The percentage may be the only royalty rate that can be achieved using only Paragraph 3(e) of the Arkon Settlement—but High Gear never agreed to be bound by Paragraph 3(e),[7] and Voth ignored other methods of calculating the royalty when viewing the Arkon Settlement as a whole. (*See* Tr. 98:17–23.)

42.     For his analysis, Voth assumed the sales price of the RoadVise is $3.38 a unit.[8] (Tr. 60:22–61:1.) He performed no additional analysis of this price or established whether $3.38 per unit should be used when calculating the royalty rate for the RoadVise. (Tr. 109:8–110:10.)

43.     He used two methods to calculate the average sales price of the cradle portion of the High Gear TechGripper. (Tr. 66:23–67:2.)

44.     In Method 1, Voth took the total revenue for all of the products High Gear was selling from December 2015 until May 2019 and divided by the number of units sold. (Tr. 67:7–14.) This yielded an average per unit of $23.10. (Tr. 67:14–15.)

---

[7] To the extent this is a legal conclusion, *see infra* Section IV, ¶¶ 18–19. High Gear agrees to be bound only by the "lowest negotiated royalty rate" that applies to the RoadVise as part of the Arkon Settlement. *See id.*

[8] $3.38 is the average sales price of all Arkon accused products and comes from George Miller's expert report that is referenced in Paragraph 3(e). (Tr. 40:10–25; JPS. ¶¶ 16–17.)

45. The data used in Method 1 encompassed any product that included a TechGripper; the majority of these were kits and included a mount system with associated bracketry. (Tr. 70:25–71:3, 153:2–154:1.)

46. High Gear testified that, when sold separately, the mount sells for more than the cradle and has more value. (Tr. 154:2–154:8.)

47. The Court pressed Voth on Method 1: if the royalty rate is related only to the average price of the cradle or unit, what was the point of computing the averages sales price of *any* High Gear product, including kits, that contained a TechGripper? (Tr. 67:16–68:5.) Voth had several explanations, none satisfying. (Tr. 69:14–15.) First, "because it was in the data that High Gear presented to us" (Tr. 68:12–20)—but availability doesn't equate to relevance. Second: "we need to know the number of units" (Tr. 68:23–24)— sure, but why average the price of kits? Finally, because kits have different prices than cradles, "by coming up with a common basis, a common value per unit for just the cradle, that gives us a number that we can multiply by the 20.5 percent. . . . We need to multiply the 20.5 percent by a dollar value." (Tr. 69:7–12; 69:23–24.) Yes, the Court needs a dollar value to multiply by if it uses a percentage—but why this value, why $23.10? Voth could not justify how averaging the higher price of kits arrives at just the cost of the cradle portion included in those kits.

48. For Method 2, Voth looked at historical data for the three products

highlighted in the sales data as being cradle-only products. (Tr. 71:6–8.)

49.     Voth looked at four time periods for the historical sales data of the TechGripper: July 2014 to February 2015 ($25.68 per unit); March 2015 to April 2017 ($23.39 per unit); April 2017 to May 2018 ($22.06 per unit); May 2018 to June 2018 ($23.08 per unit). (Tr. 72:21–73:6.) Voth was "uncomfortable" with the most recent data from June 2018 to May 2019 because the price of a TechGripper decreased to $10 a unit. (Tr. 73:16–74:3.) This drop "just didn't make sense" to Voth, "given the consistency over the four years prior" and the prices listed by High Gear and on Amazon. (Tr. 74:3–6; 75:1–17.) So he excluded the lower-priced data. (Tr. 73:19–24.)

50.     Lee testified High Gear had recently cut prices dramatically to increase the volume of sales—with salespeople now focusing on bulk sales to high-volume customers like Arkon—and because the market had become saturated. (Tr. 154:13–19.) NPI presented no evidence contradicting this and the Court finds this explanation and the testimony of Lee credible.[9]

51.     Voth admitted he included sales numbers from July 2014 to February 2015 (the highest sales price)—despite his position that damages should be calculated starting from the date suit was filed, in December 2015. (Tr. 57:23–58:1; 130:25–131:12) He "just wanted to look at that complete dataset"

---

[9] The Court provides an assessment of Mr. Lee's testimony at *supra* Section III, ¶ 10.

and the decision didn't matter because "it really doesn't move the needle from the $23 a unit we're looking at." (Tr. 133:7–13.) But, again, just because the data is available—or has a minimal impact on the end result—does not make it relevant.

52. Using this data, Voth arrived at an average sales price for the cradle of $23.14. (Tr. 73:5–11.)

53. The Court finds neither Voth's testimony nor his analysis credible. (*See infra* Section III, ¶¶ 54–57.)

54. Neither method analyzes whether other features of the TechGripper provide value but are not covered by the '212 patent. (Tr. 121:22–122:10.)

55. Method 1 does not tease out the price of a cradle when sold as a kit, but rather incorporates other non-cradle elements including mounts and bracketing. (Tr. 123:22–124:9; *see also infra* Section III, ¶ 51.) So Voth never analyzed the price of a cradle when sold as a kit—though the cradle is worth less than the mount. (Tr. 153:23–154:8.)

56. Method 2 neglects the majority of TechGrippers sold, looking only at TechGrippers sold independently. And it unjustifiably excludes more recent—lower—prices that fall inside the damages period while including older—higher—prices that fall outside his proposed damages period. (Tr. 133:3–7.) Voth admitted he had no unexplained basis for disputing the accuracy of the recent data, yet still he excluded it from his analysis. (Tr.

132:18-23); *cf. supra* Section III, ¶ 50.

57. Finally, Voth cannot explain why identical products, the RoadVise and the TechGripper, should have drastically differently royalty values. Voth used the lower average sales price of $3.38 when arriving at the 20.5% royalty rate for the RoadVise. (Tr. 60:22–61:1.) Yet he concluded the price of the TechGripper cradle is around $23 — yielding a dollar-per-unit royalty amount *over six times higher* that of the identical RoadVise. (Tr. 67:14–15, 73:4–6, 120:11–19.) When pressed, Voth couldn't explain why the value of the patent would be so different in identical products, dissembling instead. (*See* Tr. 120:20–121:21, 128:11–21 (repeatedly disputing use of the word "value" when talking about the average sales price); *cf.* Tr. 128:23–129:18 (admitting there is nothing mathematically wrong with calling the average sales price a value).) It stretches credulity to conclude the value of a patent in one product is over six times the value of the same patent in the same product made by the same company but sold under a different brand — at least as here where there is no implication let alone evidence the brand is worth anything.

### E. The Lowest Negotiated Royalty Rate

The Court has divided its opinion into findings of fact and questions of law. Contract interpretation is a question of law. *Dear v. Q Club Hotel, LLC*, 933 F.3d 1286, 1293 (11th Cir. 2019). But many of the key questions, including the intent of the parties and the

ultimate damages and royalty rate calculation, involve questions of fact. *See Winn-Dixie Stores Leasing, LLC v. Dolgencorp, Inc.*, 746 F.3d 1008, 1021 (11th Cir. 2014) (explaining "if the language is ambiguous and the district court must look to extrinsic evidence to determine the intent of the parties, the district court's determination of such intent is a finding of fact") (citations and internal quotation marks omitted).

In the interest of clarity, the Court will briefly summarize its interpretation of the Stipulation here, since it contextualizes these factual findings. Paragraph 3(e) is not binding on the parties and the Court does not have to calculate the royalty rate as a percentage. *Infra* Section IV, ¶¶ 18–19. Instead, the Stipulation instructs the Court to determine how many cents per unit Arkon paid to settle its dispute with NPI—and apply that price-per-unit rate to the TechGripper. *Infra* Section IV, ¶¶ 20–27. And the Court must seek to calculate the lowest rate—and so include the maximum number of products—that was bargained for as part of the Arkon Settlement. *Id*. But the Court will use the full lump sum payment, not deducting any amounts for the value of the general release or other provisions. *Id*.

### i. Stipulation—Intent of the Parties

58. NPI provided no evidence of intent when entering the Stipulation. *See supra* Section III ¶ 11.

59. High Gear intended to receive the benefit of Arkon's bargain, paying however much Arkon paid in the Arkon Settlement, adjusted for volume. (*See* Tr. 151:11–22, 152:3–7, 152:11–15.) This testimony does not contradict

the express terms of the Stipulation and it accurately reflects the bargain struck by NPI and High Gear. *See infra* Section IV, ¶ 26.

### ii. What Was Negotiated

60. Paragraph 3(e) is not persuasive evidence of the royalty rate the parties "negotiated." (*See* Tr. Ex. 2.) Brassard testified the lump sum payment was proposed by him before Paragraph 3(e) was drafted. (Tr. 164:12–14, 168:13–17.) Paragraph 3(e) does not account for IBOLT sales, despite IBOLT products being covered by the Arkon Settlement. (Tr. Ex. 2.) And it does not mention the broad release provision or the value of a paid-up license contained in the Arkon Settlement. (*Id*.) So Paragraph 3(e) fails to accurately capture the "lowest negotiated royalty rate." (Tr. Ex. 3.)

61. The time period negotiated in the Arkon Settlement includes pre-suit products. While Arkon initially sought to preclude pre-suit damages, the California court denied its motion. (Tr. 33:6–34:1.) On the date of settlement, all damages—including pre-suit damages—were in play. (*Id.*; Tr. 166:1–9.) Since the claims were resolved by the Arkon Settlement, they are part of the bargain NPI and Arkon struck and must be included in the calculation.

### iii. Calculation of the Lowest Negotiated Royalty Rate and High Gear Damages

62. Arkon sold 741,163 accused products between June 2010 through December 2015 (pre-suit). (Tr. Ex. 4, p. 19.)

63. The total Arkon products expected to be sold from the date suit was filed

through the life of the patent is 1,446,492. (JPS. ¶ 18.)

64.    IBOLT sold 166,775 products between 2014 and 2015 (pre-suit), and 75,363 products from 2016 to 2018.[10] (Tr. Ex. 4, p. 20.)

65.    Arkon and IBOLT jointly paid NPI $1 million dollars for a paid-up license to the '212 patent. (JPS. ¶ 14; Tr. Ex. 2.)

66.    So Arkon and IBOLT collectively paid $1 million for 2,429,793 units (the sum of: 741,163 pre-suit Arkon units; 1,446,492 expected post-suit Arkon units; 166,775 pre-suit IBOLT units; and 75,363 post-suit IBOLT units), yielding a royalty rate of $0.41 per unit.

67.    High Gear has sold 65,154 units of the TechGripper between December 23, 2015 and May 20, 2019.[11] (Tr. Ex. 5 at 2.)  This equates to past royalties of $26,713.14. For sales after May 20, 2019 through the end of the life of the '212 patent (August 20, 2021), for which High Gear has not yet provided sales data, the same royalty rate ($0.41 per unit) will apply.

## IV.    CONCLUSIONS OF LAW

The Court must first determine which state's law controls the interpretation of the contract. Next, the Court must determine if the contract is ambiguous and if parol evidence is admissible.  Finally, the Court determines the meaning of the contract and the

---

[10] In its trial brief, High Gear claimed IBOLT was expected to sell 92,000 units post-suit—but evidence to support this number was not provided at trial. (*See* Doc. 107, p. 7.) So the Court will look to the most recent sales data provided in the parties' joint exhibits. (Tr. Ex. 4, p. 20.)
[11] NPI is not seeking pre-filing damages. (Tr. 88:22–24.)

proper method of calculating the royalty rate.

A. **Choice of Law**

1. The Arkon Settlement contains a choice-of-law provision specifying Washington state law. (Tr. Ex. 2, p. 4.) But High Gear never agreed to be bound by the choice-of-law provision in the Arkon Settlement. *See infra* Section IV, ¶¶ 18–19; (*see also* Tr. Ex. 3). This provision has no effect against High Gear.

2. "Under Florida's choice-of-law rules, *lex loci contractus* applies in contract matters . . . ." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1093 (11th Cir. 2004) (citations omitted). *Lex loci contractus* "provides that the law of the jurisdiction where the contract was executed governs interpretation of the substantive issues regarding the contract. *Id.* at 1093, n.1 (quoting *Lumbermens Mut. Cas. Co. v. August*, 530 So. 2d 293, 295 (Fla. 1988)).

3. The Stipulation was entered into during Florida litigation in a Florida federal court. (*See* Doc. 119, p. 3; Doc. 60-1.) Florida law controls.

B. **Parol Evidence**

4. Under Florida law, a contract term must be ambiguous on its face before a court can resort to parol evidence to define that term. *Downs v. United States Army Corps of Eng'rs*, 333 F. App'x. 403, 411 (11th Cir. 2009) (citing *J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 485–86 (Fla. 1957)).

5.    Parol evidence is not admissible to explain a patent ambiguity. *Johnson Enters. of Jacksonville v. FPL Grp., Inc.*, 162 F.3d 1290, 1310 (11th Cir. 1998). "A patent ambiguity . . . appears on the face of the instrument and arises from the use of defective, obscure, or insensible language." *Johnson Enters.*, 162 F.3d at 1310 (quoting *Crown Mgmt. Corp. v. Goodman*, 452 So. 2d 49, 52 (Fla. 2d DCA 1984)).

6.    But extrinsic evidence is admissible for latent ambiguities, "where a contract fails to specify the rights or duties of the parties in certain situations and extrinsic evidence is necessary for interpretation or a choice between two possible meanings." *Johnson Enters.*, 162 F.3d at 1310 (quoting *Crown Mgmt.*, 452 So. 2d at 52). There, "this evidence is required because the instrument itself does not provide sufficient insight into the intent of the parties." *Id.*

7.    If an ambiguity occurs, a "trial court is authorized to admit parol evidence to explain the words used and how the contracting parties intended them to be interpreted." *Solymar Inv., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 991 (11th Cir. 2012) (quoting *Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So.3d 1000, 1002 (Fla. 2d DCA 1995)).

8.    The Stipulation is latently ambiguous. It specifies that High Gear must pay the lowest negotiated royalty rate, but there are two ways of calculating royalty rates. *See infra* Section IV, ¶ 16. The Stipulation does not specify

what values must be considered when determining the negotiated value. (*See* Tr. Ex. 3.)

9.  So the Court will consider extrinsic evidence—including the terms in the Arkon Settlement, the testimony of witnesses, and the available sales data— in determining the applicable royalty rate. In reaching its decision, the Court properly considered the evidence used to make all findings of facts listed above. *See supra*, Section III.

## C.  Interpretation of the Stipulation

### i.  Plain Language of the Stipulation

10.  High Gear and NPI signed the Stipulation. (Tr. Ex. 3.) The Stipulation is the contract at issue; those terms are binding on the parties.

11.  The entire applicable contract language is: "High Gear agrees to be bound by the lowest negotiated royalty rate agreed to by between NPI and Arkon for past damages and future royalties, respectively, which will apply to the Arkon RoadVise and High Gear TechGripper product as it currently exists." (Tr. Ex. 3, p. 4.) There is no other relevant, applicable contract language.

12.  "It is axiomatic that the first task of a court in contract interpretation is determining from the agreement itself and the surrounding circumstances what the intent of the parties was." *S. Bell Tel. & Tel. Co. v. Fla. E. Coast Ry. Co.*, 399 F.2d 854, 856 (5th Cir. 1968). "It is well settled that the actual

language used in the contract is the best evidence of the intent of the parties
. . . ." *Rose v. M/V "GULF STREAM FALCON"*, 186 F.3d 1345, 1350 (11th Cir.
1999) (citations omitted).

13. Looking at the actual language of the contract—the Stipulation—it boils
down to three critical terms: (1) lowest; (2) negotiated; and (3) royalty rate.
(Tr. Ex. 3, p. 4.) The Court takes each one in turn.

14. First, "lowest." By agreeing to the "lowest" rate, NPI agreed to give High
Gear the best bargain Arkon struck when negotiating with NPI. When there
are multiple possible rates, the Court must choose the one that yields the
smallest rate to High Gear.

15. Second, "negotiated." Negotiate means "[t]o communicate with another
party for the purpose of reaching an understanding" or "[t]o bring about
by discussion or bargaining." *Negotiate*, BLACK'S LAW DICTIONARY (11th ed.
2019). Since the Stipulation does not specify which inputs to use, the Court
must consider extrinsic evidence in determining what was "negotiated" for.
*See supra* Section IV, ¶¶ 8–9. The Court will need to determine what royalty
rate was arrived at by discussion or bargaining, looking to the evidence
presented about the negotiations and what the Arkon Settlement provided.

16. Third, "royalty rate." This is the most critical of the three terms, but it can
have multiple meanings. A "royalty rate" can be calculated either as a
percentage or as a dollar amount per unit. *See e.g., Commonwealth Sci. &*

*Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1300, 1303 n.1 (Fed. Cir. 2015) (calculating the royalty rate as cents per end unit sold); *cf. Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.3d 1075, 1082 (Fed. Cir. 1983) (calculating the royalty rate as a percentage); (*see also* Tr. 105:16–22 (Voth agreeing it is "perfectly acceptable" to express a royalty rate in a per-unit basis or as a percentage)). So the Stipulation does not guide the Court in calculating the royalty rate, only that it must calculate one.

17. Taken together, these three terms task the Court with determining what was the best royalty rate, as either a percentage of sales or as a price-per-unit amount, that Arkon bargained for when signing the settlement with NPI.

### ii. Effect of the Arkon Settlement on High Gear

18. Equally important is what those three terms *do not* mean—they do not mean High Gear agreed to be bound by the Arkon Settlement. High Gear easily could have, but did not, agree to be bound by the Arkon Settlement. Instead, High Gear and NPI chose, as evidenced by the contract language itself, to bind themselves to the royalty rate negotiated in the Arkon Action. High Gear was not a party to the Arkon Settlement and the Arkon Settlement is not the contract the Court is interpreting. So the Arkon Settlement is evidence of the royalty rate negotiated between Arkon and NPI—but its individual terms are not binding on High Gear.

19.    Specifically, Paragraph 3(e) is not binding. Paragraph 3(e) is one provision

of the Arkon Settlement. But as a single provision of the Arkon Settlement,

to which High Gear never agreed to be bound, it is only one piece of

evidence of the negotiated royalty rate—it is not conclusive.

**D.    Basis for Royalty Rate**[12]

20.    A dollar amount per unit royalty is the appropriate method of calculating

the negotiated rate.

21.    From the plain language of the Stipulation, NPI agreed to give High Gear

the best royalty rate Arkon bargained for. *See supra* Section IV, ¶¶ 10–17.

22.    Exactly how to calculate that royalty rate is ambiguous, but Lee's testimony

provided additional evidence of the intent of the parties and the meaning

of that term: he intended to pay the same amount Arkon paid for the

RoadVise, scaled for volume. *See supra* Section III, ¶¶ 58–59. Scaling for

volume yields a price-per-unit royalty rate. Based on the Stipulation and

the testimony of Lee, the Court finds the most appropriate method of

calculating the royalty rate is on a price-per-unit basis.

23.    NPI's arguments to the contrary are unavailing. NPI—Plaintiff and party

with the burden of proof—failed to demonstrate a percentage is the

appropriate method. NPI offered no credible evidence of its intent when

---

[12] Much of this final contract interpretation involves mixed questions of fact and
law. To the extent any legal conclusion represents a finding of fact, the Court so finds by
a preponderance of the evidence and adopts it as such.

entering the Stipulation or its current understanding. *See supra* Section III, ¶ 11. There was no credible or persuasive evidence the Arkon Settlement negotiated a royalty rate on a percentage basis. *See supra* Section III, ¶¶ 37, 53, 60 (finding neither of NPI's witnesses credible nor Paragraph 3(e) to reflect the true bargain struck in the Arkon Settlement). The Arkon Action settled for a lump sum in exchange for a general release and a paid-up license on all products; there is no indication from either the Arkon Settlement or testimony on its negotiation that either Arkon or NPI valued the '212 patent differently depending on the price of the accused product. Nor was evidence presented that they should have. (*See* Tr. 188:5–192:21 (NPI relying only on the language of Paragraph 3(e) in justifying a percentage royalty rate).)

24.  Even *if* the Court was inclined to use a percentage method, NPI failed to credibly establish what price the Court should use for the TechGripper. Voth found the price of the TechGripper to be over six times that of the price he had assumed for the identical RoadVise—treating the RoadVise and TechGripper so differently cannot be reconciled. The Stipulation provides High Gear may have Arkon's bargain—and it's not the same bargain if High Gear has to pay six times as much as Arkon for an identical product.

25.  Finally, even *if* the testimony of Voth was credible *and* Paragraph 3(e) was not discounted as unpersuasive—that would still leave two equally

reasonable methods of calculating the negotiated royalty rate of the RoadVise, depending on which terms of the Arkon Settlement are considered. The Stipulation—the relevant binding contract—instructs the Court to choose the *lowest* one. Here, calculating the royalty rate on a price-per-unit basis yields the lowest negotiated rate; it is the one the Court must apply.

26.     So the Court must determine how many cents per unit Arkon paid to settle with NPI. In making this determination, the Court seeks to calculate the lowest rate—and so include the maximum number of products—bargained for as part of the Arkon Settlement. No other calculation follows both the plain language of the Stipulation and the intent of the parties in entering the contract.

27.     The Court will not deduct any amount from the lump sum payment when calculating the royalty rate to account for provisions such as the general release. The Stipulation instructs the Court to calculate how many cents per unit Arkon ultimately paid for its products; the simplest and most accurate way to calculate that amount is to look at how much money Arkon paid for a total number of products. *See supra* Section III, ¶¶ 60–68. With its $1 million payment, Arkon and IBOLT bought their peace—and the price-per-unit calculation appropriately accounts for that peace, by spreading out the value of that peace among each of the accused products.

## V.    CONCLUSION

It is **ORDERED AND ADJUDGED**:

1.    The Court **AWARDS** Plaintiff National Products, Inc. $26,713.14 for past royalties through May 20, 2019 against Defendant High Gear Specialities, Inc.

2.    For sales after May 20, 2019 through the end of the life of the '212 patent (August 20, 2021), for which Defendant High Gear Specialties Inc. has not yet provides sales data, a royalty rate of $0.41 per unit will apply.

3.    The Clerk is **DIRECTED** to enter final judgment for Plaintiff National Products, Inc. and close the file.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on February 3, 2020.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record